IN THE UNITED STATES DITRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# 10-22921-CV-Huck/ O'Sullivan

RICHARD SARTORIO,
on behalf of himself and
others similarly situated

    Plaintiff,

v.

MERSCORP, INC., a foreign corporation;
LAW OFFICES OF MARSHALL C. WATSON, P.A.,
a Florida professional association, MARSHALL C. WATSON,
SHAPIRO & FISHMAN, LLP, a Florida professional association,
BARRY S. FISHMAN, GERALD M. SHAPIRO,
FLORIDA DEFAULT LAW GROUP, P.L.,
a Florida professional association, individually,

    Defendants.

_____/



FILED by _____ D.C.

AUG 1 2 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. - MIAMI

### COMPLAINT

Comes now the Plaintiff, Richard Sartorio, on his own behalf and on behalf of others

similarly situated, and sues the Defendant, Merscorp, Inc., The Law Offices of Marshall

C. Watson P.A., and Marshall C. Watson, Shapiro & Fishman, LLP, Barry S. Fishman,

Gerald M. Shapiro, Florida Default Law Group, P.L., Michael J. Echevarria, individually

as follows:

1

## The Nature of the Action

1.     This is an action for triple damages, costs and attorneys fees under 18 U.S.C.

$$1962 and 1964, otherwise as the "Racketeer Influenced and Corrupt organizations Act"

or "RICO".

## The Named Parties

2.     Richard Sartorio is the Plaintiff. He brings suit as Class Representative. He has

standing to sue in that capacity because he possesses the same interest and suffered the

same type of injury as all other Class Members.


3.     Defendant Merscorp, inc., is a foreign corporation created in or about 1998 by

conspirators from the largest banks in the United States in order to undermine and

eventually eviscerate long-standing principles of real property law, such as the

requirement that any person or entity who seeks to foreclose upon a person of real

property: 1) be in possession of the original note and mortgage and 2) posses a written

assignment giving he, she or it actual rights to the payments due from the borrower

pursuant to the mortgage and note. Defendant Merscorp, Inc. claims to be the sole

shareholder in an entity by the name of Mortgage Electronic Registrations Systems, Inc.,

("MERS"). MERS is the RICO enterprise and is the primary innovation through which

2

the conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this complaint.

4.      The Defendants Law Offices of Marshall C. Watson, P.A., Shapiro & Fishman, LLP, and Florida Default Law Group, P.L., (hereinafter "the Defendant Firms"), are the professional associations with their principal place of business in Fort Lauderdale, Florida; Tampa, Florida; and Tampa, Florida respectively. The Defendant's Firms attorneys primarily represent plaintiffs in foreclosure actions. Based upon statements by its owner and co-Defendant, Marshall A. Watson, the Defendant Firm in 2008 and 2009 filed between 4000 and 7000 new foreclosure actions in the State of Florida per month. Beginning in or about 1999, the Defendant Firm joined with Defendant Merscorp, inc., and other conspirators in the fraudulent scheme and RICO enterprise herein complained of. The employees of the Defendant Firms, including many licensed attorneys, have becomes skilled in using the artifice of MERS to sabotage the judicial process to the detriment of borrowers, and, over the past several years, have routinely relied upon MERS to do just that.

5.      Marshall C. Watson is an attorney licensed in Florida since 1983. He is the sole owner of one of the Defendant Firms, The Law Offices of Marshall C. Watson, P.A. He is responsible for the actions because he caused them, and also because attorneys and other professionals may not use a corporate façade to protect them from liability arising

from the practice of their professions. Barry S. Fishman and Gerald M. Shapiro are attorneys licensed in Florida since 1969. They are the owners of one of the Defendant Firms, Shapiro and Fishman, LLP. They are responsible for the actions because they caused them, and also because attorneys and other professionals may not use a corporate façade to protect them from liability arising from the practice of their professions. Michael J. Echevarria is an attorney licensed in Florida since 1983. He is the sole owner of one of the Defendant Firms. He is responsible for the actions because he caused them, and also because attorneys and other professionals may not use a corporate façade to protect them from liability arising from the practice of their professions. Marshall C. Watson is also founder of Watson Title Insurance, Inc. This entity functions as a title company, and it makes its revenue doing "title work" to assist in the disposition of foreclosed properties. According to its company profile it provides legal and non-legal services regarding "lender owned real estate."  Properties of this type, which are owned by the lenders or other real estate parties in interest, are referred to as "REO's." Marshall C. Watson uses Watson Title Insurance, Inc. to perform "processing" and title services relating to those post-foreclosure REO properties, thereby increasing the massive profits from the illegal enterprise herein described. While it purports to function through one or more "subsidiaries", its telephone number is the same as the one listed for the Defendant Firm. Marshall C. Watson through this and other "spin-off" entities, has made hundreds of millions of dollars fraudulently subverting the judicial process and the constitutional safeguards design to protect the rights to litigants so as to manufacture a foreclosure and

4

foreclosure-litigation industry which simply drives the hapless citizens in his path to cycle after cycle of impossible loan and inevitable foreclosure.

**Narrative Background: "A Subtle Stranger" Orchestrates a Paradigm Shift**

6.     In and about 1998 and 1999, the mortgage industry introduced new "products" into the American marketplace. These products included "non-documentation loans" and adjustable rate mortgages known as "ARMS." Mortgage lenders acting in coordination with one another, relaxed their standards for lending, which made an entirely new class of lower-income individuals eligible to receive loans. This, in turn, drove up property "values." As part and parcel of this scheme, banks and other lenders "accepted" appraisals documenting the new, higher values, and approved hundreds of thousands of applications for financing, most of which would normally have been declined.

7.     Unbeknownst to the borrowers and the public, the billions of dollars spent to fund these loans were expended to "prime the pump." The big institutions and the conspirators were making an investment, but the expected return was NOT the interest they pretended to anticipate receiving as borrowers paid the mortgages. The lenders knew that the new loans were "bad paper," this was of little concern to them because they intended to realize profits so great as to render such interest, even if it had been received, negligible by comparison. Part of the reason this fraudulent

5

scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of average persons. Similarly beyond the imagination of most persons is and was the scope of the **DISHONESTY** of the lenders and those acting in furtherance of the scheme, including the present Defendants. Through the present time, persons acting within the ambit of this conspiracy, most particularly including the Defendants herein, have continued to operate consistent with the core principles of dishonesty and obscurantism engendered by the original conspirators. These dark have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the financial stability of the United States and the world as a whole. This court is urged in the strongest possible way to apply a presumption of **FALSITY** when reviewing any documentary evidence filed by one or more of the Defendants. Such a presumption is not just warranted; it is indeed compelled by the extent to which the Defendants and those with which they are associated have long acted in a malicious and wanton manner evincing complete contempt for the judicial process and the rights of persons having interest contrary to their own. This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic and legitimate.

6

8.      There is one sort of lie, that when later discovered, constitutes the strongest

possible proof of a person's malicious intentions. What is it? A lie about one's name

or identity. Many such lies are present in the instance. The whole purpose of MERS is

to allow "services" to pretend as if they are someone else: the "owners" of the

mortgage, or the real parties in interest. In fact they are not. The standard

MERS/Marshall/Shapiro & Fishman/Florida Default complaint contains a lie about

this very subject. While the title of the standard complaint makes reference to lost

loan documents, in the body of the standard complaint, the Defendant Firms allege

that the plaintiff is the "owner and holder" of the note and mortgage. Both cannot be

truth unless the words used are given new meanings. (Sample attached as Exhibit A).

Sometime after March 13, 2008, but February 12, 2009, the Defendant Firm changed

the standard complaint so that it now reads: "Plaintiff, as servicer for the owner and

acting on behalf of the owner with authority to do so, is the present designated holder

of the note and mortgage with authority to pursue the present action." Yet in this

latest version, the Defendant Firms describe an assignment of the mortgage which has

already occurred, with the "assignee" being the plaintiff in the case - - the same

plaintiff who is simultaneously described as the "designated holder" who is "acting

on behalf of the owner." (Exhibit B). This is a contradiction: either the plaintiff is

designated to act in behalf of the real party in interest, or it is *itself* the real party in

interest pursuant to the alleged "assignment."

9.     In the years leading up to the introduction of the new loan "products," the conspirators laid the groundwork which would grow into a new mortgage lending infrastructure: a new paradigm in which the ratios of risk and reward were dramatically altered in favor of these monied interests and to the detriment of common consumers. One material bulwark in the support for this new paradigm was the inclusion of intentionally ambiguous and infinitely malleable provisions pertaining to MERS. As is the case with most of the written documents routinely used in the scheme, such as "assignments" and complaints for foreclosure, each word concerning MERS in these standardized mortgages is carefully crafted so as to allow those relying upon it to infinitely recede in their positions and to be moving targets virtually unreachable by standard legal means. The standard mortgage is a form entitled "FLORIDA-Single Family Fannie Mae/Freddie Mac UNIFORM INTRUMENT-MERS," or some slight variation thereof. Upon reading the standard mortgage clauses pertaining to MERS, even persons of high intelligence will have a sense that they should, but do not quite, comprehend them.  Consider this:

> "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this security instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888)679-MERS.

[....]

TRANSFER OF RIGHTS IN THE PROPERTY

8

This Security Instrument secures to lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the note; and (ii) the performance of the borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, "Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS. The following described property located in the COUNTY of DADE."

[....]

Borrower understands and agrees that MERS hold only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of lender including, but not limited to, releasing and canceling this Security instrument.

(Typical MERS mortgage and note are attached hereto as Composite Exhibit C).

10.     Beginning soon after the "ink" on the new mortgages was "dry"; the lenders promptly sold their loans, in secretive transactions, to "investors" for some percentage or fraction of what had been the alleged value of the mortgage and the property by which it was secured just days or weeks earlier. The quick sale by the lender of its interest, at what appears to be a loss, would have at first seemed inexplicable, but when considered with the benefit of hindsight, proof of these quick transfers would have been evidence that the lender knew in advance that property values would soon decline. By constantly changing "servicers" on these loans, an by sending out notices of such changes drafted also intentionally ambiguous verbiage, the bankers behind the scene cooperated in obscuring the truth as to who had the right to receive to proceeds of the loans, and to foreclose in the event of non-payment. The

9

loans were grouped into "pools" and sold multiple times, thereby increasing profits for the wrongdoers. These "securitized debt pools" were sold on the stock market and elsewhere, and this matter affected interstate commerce. The real parties in interest also in many instances collected mortgage insurance upon "default."

11. Another part of the scheme was the use of words in ways inconsistent with their traditional meanings, and the creation of new terms which could be used to blur important distinctions between parties and their interests. The revolutionary way in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower. For example, "mortgagee" began to have a meaning other than "lender." See n. 4, supra. "Servicer" arose to prominence and was and is used to further obscure important truths. Specifically, the "Servicer" may or may not the true beneficial interest in the mortgage, and the Defendants will NOT release any further information of the subject, whether it is requested in discovery in a foreclosure action or in any other context.

12. With the oversight of Defendant Merscorp and its unknown principals, the MERS artifice and enterprise evolved into an "ultra-fictitious" entity, which can also be understood as a "meta-corporation." To perpetuate the scheme, MERS was and is used in a way so that the average consumer, or even legal professional, can never

determine who or what was or is ultimately receiving the benefits of any mortgage payments. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smoke screen which has left the public and most of the judiciary "operating in the dark" through the present time.

13. Although not an element of the Plaintiff's cause of action, the truth of the matter is that reasoned contemplation of the available facts leads to a stunning realization: the mortgage crisis and resulting economic downturn which the United States is currently afflicted was **planned in advanced by certain sections of Wall Street**. In addition to the other incriminating facts set forth in this Complaint and documented in the exhibits hereto, consider this: On its website, www.mersinc.org, Defendant Merscorp lists the shareholders of "MERS," which is defined in a separate page of the site as "Mortgage Electronic Systems Registration Systems, Inc." Among the shareholders of MERS,  according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo. These are many of the same institutions the Defendant Firm represents. This is no coincidence, as the entities are co-conspirators in the MERS scheme herein described.

14. The conspirators intended to maintain and absolute stranglehold on the American economy for many decades, if not centuries, into the future. This could only be

11

accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment. The point is that the conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greedy interest over the longest period of time. Through this revolution in the use of words and ephemeral concepts such as the "corporation", the conspirators, including the present Defendants, have by-and-large been successful in changing the paradigm so that the rights of individuals are no longer afforded the safeguards which have been carefully maintained in places since the time of the Magna Carta. As the conspirators and present Defendants have long intended, certain important terms in the mortgages and other legal documents are devolving into a state of meaninglessness. Even the names of the mortgage and lending institutions are tinkered with and interchanged so often that it is difficult to keep track of the constantly shifting parameters of the series of alleged mergers, assertions of subsidiary relationships, "divisions," and the like with which the American economy and consumer populace are deluged in advertisements and mortgage documents. This is not some random trend which resulted from the mortgage crisis. It is instead, just another tactic in the vast scheme which ultimately caused it. The end result of the continued obfuscatory actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

15. The conspirators of course did not want them to be any documentation which could later be used as evidence of their crimes. They did not want to pay the fees associated with recording mortgages and they did not want to be bothered with the trouble of keeping track of the originals. That is the significance of the "Electronic" in Mortgage Electronic Registration Systems, Inc. The conspirators, through this exceptionally sophisticated legerdemain, made over the American judicial system's long-honored requirements for mortgage and foreclosures to serve their own selfish interest and to minimize the possibilities of the victims obtaining any meaningful redress through the courts. They undermined long-established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements. While conversation to electronic loan documentation will eventually be implemented, it is the **People**, by and though their elected representatives, who will ultimately bring about this transaction through duly enacted legislation.

### The Defendants' Creation and Use of Fraudulent Assignments

16.    In the cases in which the Class Members asserted a "standing" defense, whether in *propia persona* or by counsel, the Defendant Firm and the Defendant Merscorp, Inc. relied upon MERS to obscure the truth and illegally obtain final judgments of foreclosure. If pressed on the standing issue, the Defendant Firm would generate

13

fraudulent "assignments" which, like all the other documents used to perpetuate the scheme from its inception, were intentionally ambiguous. (A collection of fraudulent and facially defective "assignments" created and filed by the Defendants Firm is attached hereto as Composite exhibit D). In these remarkable and totally fraudulent "assignments" the following irregularities usually appeared:

    a.  The assignor, MERS, had the same address as the assignee (the plaintiff)

    b.  They were executed by a person signing as "Assistant Secretary;" and

    c.  The document would have an "effective date" well prior to the date upon which it was executed, so as to retroactively give standing to the plaintiff

17.    Incredibly, since 2009 it has come to light that the person signing these assignments as "assistant secretary," and occasionally as "vice president" of MERS actually were NOT officers or employees of MERS. Instead, these persons, such as a woman by the name of Caryn A. Graham, actually are and were employees of the Defendant Firms.

18. The plaintiffs represented by the Defendant Firm simply had no standing whatsoever. Even in the cases in which, due to a challenge by the defendant(s), one of these bogus, fraudulent assignments was fabricated and filed, the plaintiffs were not the real parties in interest. The attorneys of the Defendants Firm filed these assignments with the courts while being fully aware that they were misleading fabrications designed

specifically to disenfranchise the borrower-defendants. The assignments, in addition to being fraudulent, were not <u>competent</u> to convey any interest in the property or to bestow standing upon the strawman assignee/plaintiffs. As detailed below, Defendant Merscorp, Inc. allowed the Defendant Firm to use its "name" in creating and utilizing these assignments.

19. The Defendants, by working in concert through the use of the MERS artifice, succeeded in obtaining final judgments of foreclosure against Class Members and in favor of plaintiffs whose standing was nil, both substantively and technically. These final judgments led to foreclosure sales pursuant to which the Class Members were dispossessed of their properties. While each case proceeded along different routes, depending on whether the homeowners attempted to defend on their own, hired counsel, or simply allowed default to be entered, the end result was the same: The Class Members were robbed of their properties. The RICO enterprise herein complained of was the proximate cause of these damages.

20. The preparation, filing and prosecution of the complaints to "Foreclose Mortgage and to Enforce lost Loan Documents" were each predicate acts in the pattern of racketeering activity herein complained of, and were actions taken in furtherance of the MERS enterprise. The actions could not have been brought by the Defendant Firm without the MERS artifice and the ability to generate any necessary "assignment"

15

which flowed from it. Just like MERS, the assignments were meaningless shells

designed to pull the wool over the eyes of the judiciary and ease the burden upon the

unknown real parties in interest. The practice of "non-documentation" can be seen as

common thread weaving all of the complained-of conduct into an undeniable tapestry

of a criminal enterprise proscribed by RICO.

## The Class

21. The Class Members have the following in common:

    a) Each owned Florida real property which was encumbered by a mortgage listing "MERS" as "mortgagee"

    b) Each suffered the loss of all right, title and interest in his or her property by operation of an adverse final judgment in a civil action for foreclosure in which the plaintiff was represented by the Defendant Firm.

    c) The foreclosure actions brought against the Class Members were fraudulently prosecuted in the name of the plaintiffs which were NOT the real parties in interest and which had no legal right to bring suit to foreclose or to obtain final judgment.

25. Joinder of Class Members as individual plaintiffs would be totally impractical, as

their number is believed to be in the tens of thousands. This, and the other applicable

criteria, support the certification of this Class by the Court.

## Count 1 – Violation of 18 U.S.C.$1962 [c] –
### The Law Offices of Marshall C. Watson P.A., Marshall C. Watson, Shapiro & Fishman, LLP, Barry S. Fishman, Gerald M. Shapiro, Florida Default Law Group, and P.L., Michael J. Echevarria

26. Plaintiff re-alleges paragraphs 1,2, and 4-25 here.

16

27. By engaging in a pattern of racketeering activity, specifically "mail or wire fraud," the Defendants subject to this Court participated in a criminal enterprise affecting interstate commerce. In addition to the altered postmarks described below, the mail fraud is the sending of the fraudulent assignments and pleadings to the clerks of the court, judges, attorneys, and defendants in foreclosure cases. These Defendants intentionally participated in a scheme to defraud others, including the Plaintiff and the other Class Members, and utilized the U.S Mail to do so.

28. The criminal enterprise was and is MERS, which affects interstate commerce in numerous ways. It is used to conceal the true ownership of mortgage loans from the general public, including investors, borrowers and the courts. Were it not for MERS, investors would be enabled to have a clearer picture of the assets and debts of large banking and financing institutions in which they may consider investing. Furthermore, the entire American economy has been affected by the conspiracy described in this Complaint, which is exemplified by the METS enterprise. The foreclosure crisis and larger economic downturn were substantially contributed to, and believed to have been caused, by the MERS enterprise and underlying conspiracy.

29. The "predicate acts" of fraud, which were accomplished through the U.S. Mail, and

which are specifically attributable to the Defendants subject to this Count, are:

a)      <u>Bringing suit on behalf of entities which were not the real parties in
        interest, and which had no standing to sue.</u> This involved, and involves,
        the use of the MZERS artifice.

b)      <u>Actively concealing the plaintiff's lack of standing in their standard
        complaints for foreclosure, usually entitled, "Complaint for Foreclosure
        Mortgage and to Enforce Lost Loan Documents."</u> (Exhibits A and B). It is
        believed that in 80% or more of the complaints filed by the Defendant
        Firm, it was asserted that the original loan documents had mysteriously
        been "lost". The Defendant Firm slightly adjusted the standard complaint
        over time, as problems and obstacles arose, to improve its chances for
        success and perfect or improve the concealment of the real party or parties
        in interest. The Defendant Firm attached to these fraudulent complaints
        the mortgage containing the MERS provision quoted above. While the
        title of the standard complaint makes reference to "lost loan documents,"
        in body of the standard complaint, the Defendant Firm alleges that the
        plaintiff is the "owner and holder" of the note and mortgage." Both cannot
        be true unless the words are given new meanings. (Exhibit A). Sometime
        after march 13, 2008, but before February 12, 2009, the Defendant Firm

18

changed the standard complaint so that it now reads: "Plaintiff, as servicer

for the owner and acting on behalf of the owner with authority to do so, is

the present designated holder of the note and mortgage with authority to

pursue the present action." Yet in the latest version, the Firms describe an

assignment of the mortgage which has already occurred, with the

"assignee" being the plaintiff in the case - - the same plaintiff who is

simultaneously   described as a "designated holder" who is "acting on

behalf of the owner." (Exhibit B). This is a contradiction: either the

plaintiff is designated to act on behalf of the real party in interest, or it is

itself the real party in interest pursuant to the alleged "assignment"

c)      Providing misleading authorship information and omitting the dates of

foreclosure complaints. Normally, state court complaints filed in Florida

contain the date they were signed by the plaintiff's attorney on the last

page, in the vicinity of the attorney's signature. The foreclosure

complaints filed by the Defendant Firm usually contained no date on the

last page to signify when they are signed, and usually appeared to be

signed by some person, whose signature was illegible, on behalf of the

attorney whose name appeared in the signature block.

d)      Convincing pro se Defendants to agree to a "sale date" sometime far in the

future, thereby obtaining summary judgment from the Court without any

opposition. At the date and time for the hearing on a foreclosure plaintiff's

19

motion for summary judgment, attorneys employed by the Defendant Firm often pull the defendants aside in the hallway outside the courtroom and speak in seemingly conciliatory and reasonable terms. They act s if they assisting the homeowner. They inform the *pro se* defendant something along the lines of, "If you like, to give you time, I can ask the court for an extended sale date." (The amount of time offered is usually 90-120 days). The attorney indicates that this is a concession to allow the homeowner time to continue his or her efforts to "modify" the mortgage with the "lender." The attorney then often goes into the courtroom and informs the Court that, "we have reached agreement on the motion, the defendants are asking for a 120-day sale date, and we have no objection." Modification is never consummated and the defendants' properties are sold at foreclosure sale. In this way the representatives of the Defendant firm minimize challenges on the plaintiff's entitlement to summary judgment.

e)   <u>Creating, executing, and filing fraudulent "assignments"</u> These documents were executed by an "Assistant Secretary" or "Vice President," apparently of MERS. In reality, the person executing the assignments had no knowledge whatsoever of the truth of their contents, and was simply and employee of the Defendant Firm. (Samples attached as Exhibit D).

30. These predicate acts are related. They share the common purpose of defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

31. The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through today and continue unabated, which meets the definition of "open-ended" continuity. The threat of continued criminal activity as part of this enterprise in, without question, still looming over the American economy. Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

32. As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that hey have lost their homes. The measure of the damages for the Class Members is the average of he accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints "to Foreclose Mortgage and to Enforce Lost loan Documents." Since the real parties in interest had already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties at the time of foreclosure is for this reason the measure of the damages suffered by the Class Members. To provide an example, if the average value of the properties was $250,000, and the

Class in comprised of 10,000 persons, the initial damages to which the Class in

entitled by law would be $2,500,000,000.00or 2.5 billion dollars. This amount then

tripled by the operation of the RICO law, so that, without reference to attorney fees

and costs, the total damages awarded would be 7,500,000,000.00 or 7.5 billion

dollars.

33. The Class Members are entitled to judgment in the amount of three times their actual

damages, which should be arrived in the manner indicated in the preceding paragraph,

plus costs and reasonable attorneys' fees under 18 U.S.C.$1964[c], WHEREFORE,

the Plaintiff, on behalf of the Class Members, demands judgment against the

Defendants, jointly and severally, for the total damages sustained by the Class, plus

costs, attorneys' fees, and such additional relief as the Court or jury may deem just

and proper, including imposition of liability on the members of the conspiracy not

presently named as Defendants in this action.

PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT 1

**Count II – Violation of 18 U.S.C $1962 [c] – Defendant Merscorp, Inc.**

34. Plaintiff incorporates paragraphs 1 through 3 and 6 through 25 here.

35. Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme/RICO enterprise herein complained of. Its overt acts include the following:

a)   Creation of MERS artifice;

b)   Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein;

c)   Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue;

d)   Drafting of the standard MERS language to be included in such mortgages;

e)   Entering into one or more "agreements for signing authority" with some defendants which purported to allow employees of the firms to execute assignments in which the 'assignor' and "assignee" are strawmen actually not possessed of the capacity stated, and of which the person executing the document has no knowledge;

f)   Creation and maintenance of an acceptable public image for MERS;

g)   Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems, Inc. with the necessary state agencies, plus other ministerial acts designed to maintain the

23

corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature.

h)    Facilitating the use of the MERS artifice by other participants in the scheme.

36. These predicate acts are related. They share a common purpose, defrauding the Class Members and other borrowers of their money and property. They share common themes of "non-documentation" and concealment of the real parties in interest.

37. The predicate acts satisfy the RICO continuity requirements: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants of the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed-ended" continuity.

38. As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints "to Foreclose Mortgage and to Enforce Lost Loan Documents." Since the real parties

24

in interest had already been paid, the mortgages were truly not subject to being

foreclosed upon, and the fair market value of the properties for this reason is the

measure of the damages suffered by the Class Members. The manner in which

damages should be calculated is set forth in paragraph 32, *supra*, and is incorporated

here by reference.

39. The Class Members are entitled to judgment in the amount of three times their actual

damages, which should be arrived at using the formula set forth in said paragraph,

plus costs, attorneys' fees, and such additional relief as the Court or jury may deem

just and proper, including imposition of liability on the members of the conspiracy

not presently named as Defendant in this action.

PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT 2

Respectfully submitted this 11th day of August, 2010.

> CARLOS A. SANTOS II
> Attorney for Plaintiff
> 3400 Coral Way, Suite 500
> Miami, FL 33145
> (305)856-8544
>
> By: /s  Carlos A. Santos II
> Fla. Bar No. 249009